**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

**TAMPA DIVISION**

| | |
|---|---|
| NAKIAH ALVARADO, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| - against - | Class Action Complaint |
| WALMART INC., | |
| Defendant | Jury Trial Demanded |

Plaintiff Nakiah Alvarado ("Plaintiff") alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1.     A coral consists of small, plankton-eating invertebrates called polyps.



2.     Though mistaken for inanimate rocks or plants, corals are animals.

3.     Unlike plants which make their own food, corals use tiny tentacle-like arms to capture food and consume it through their mouths.

4.     The soft-bodied polyps have an outer limestone (calcium carbonate) skeleton for protection.

5.     What most people understand as "coral reefs" begin by free-swimming coral larvae that have attached to underwater rocks or hard surfaces.

6.     Like all animals which thrive in specific geographic areas, coral reefs flourish in shallow waters

7.     This is because the algae that sustains them requires sunlight that is best absorbed when close to the ocean surface.

8.     Since the algae necessary for coral to thrive requires stable, warm temperatures, corals are generally found in tropical regions.

9.     Coral reefs expand only centimeters per year, taking thousands of years to develop.

10.    Coral and its algae are the building blocks of ecosystems which, though occupying less than 0.1% of oceans provide homes for a quarter of all marine life.

11.    The excess sugar produced by algae is transformed into a slimy mucus-like substance, which is consumed by bacteria and other smaller microbes.

12.    This attracts larger sea creatures like crabs, shrimp, snails, and worms which are also seeking food.

13.    Finally, fish and other larger marine species like turtles show up, creating an endless loop where nutrients are recycled, and the ecosystem thrives.



14. While the coral benefits from the abundance of marine activity, it also provides shelter for fish where they can reproduce and hide from predators.

 

15.   Florida's Coral Reef "stretches almost 350 miles from the Dry Tortugas to the St. Lucie Inlet."



16.   Like other coral reefs, it is a natural resource that protects this State's coast while providing a habitat for marine life of all kinds.

17.   Unfortunately, coral reefs have been placed in peril by a variety of

manmade threats and have declined by roughly half since 1950.

18.   The result is that previously teeming ecosystems have disappeared, as luminescent coral reefs become barren due to external causes such as excess nutrients like nitrogen and phosphorus, global warming, overfishing and absorption of chemicals.



19.   Within the past several years, researchers in Hawaii, among other places, determined that the chemicals in sunscreen are a significant factor in the decline of coral reefs.

20.   This was confirmed by studies in journals such as Archives of Environmental Contamination and Toxicology, which concluded the common ultraviolet filters in sunscreen, oxybenzone and octinoxate, were causing immense harm to coral reefs.

21.   Laboratory tests established that when baby coral were exposed to

oxybenzone, octinoxate and/or parabens, they experience "coral bleaching," shown by the white polyps below.



22. The loss of their symbiotic algae causes coral to turn white, rendering them more susceptible to disease and death.

23. Moreover, bleached corals means the habitat of fish and other marine life is degraded, rendering their survival and reproduction more difficult.

24. The damage caused by chemicals in sunscreens washing off swimmers and harming coral reefs has been documented by the non-profit Haereticus Environmental Laboratory ("HEL"), the National Park Service ("NPS") and scientists across the globe.

25. These groups recommend that beachgoers use sunscreen formulated to be safe for coral reefs and ocean life.

26.   This typically means avoiding chemical sunscreens which rely on synthetic compounds to absorb ultraviolet ("UV") rays from the sun.

27.   Many recommend using physical sunscreens which block harmful UV rays through zinc oxide and titanium dioxide.

28.   Seeking to capitalize on growing consumer awareness of the harm caused to these "rainforests of the sea," Walmart Inc. ("Defendant") manufactures and/or markets sunscreen labeled as "Reef Friendly" ("Product") above a drawing of a reef.



29.   The asterisk next to "Reef Friendly" corresponds to a smaller statement in the lower corner which states, "Octinoxate, Oxybenzone & Paraben Free."

30.   While early studies singled out these three ingredients as posing

existential harm to coral reefs, research has indicated that other ingredients pose an equivalent or even greater threat to coral reefs.

31.   This is confirmed by the Reef Safe Sunscreen Buying Guide from a leading snorkeling website, Snorkel Around The World.

32.   It emphasized that "Dangerous ingredients" to coral reefs  are not limited to octinoxate, oxybenzone and parabens, and include avobenzone, octoclyrene, octisalate, and homosalate.[1]



33.   That the absence of octinoxate, oxybenzone and parabens is not sufficient for a sunscreen to be sold as "reef friendly" is recognized in Hawaii, where

---

[1] Best Reef Safe Sunscreen.

the harm to coral reefs from chemical sunscreens was discovered.

34.   A prominent beachfront placard implores swimmers to "SAVE OUR REEFS" and "AVOID USING OXIBENZONE, OCTINOXATE, AVOBENZONE, HOMOSALATE, OCTOCRYLENE, OCTISALATE [AND OTHER] TOXIC INGREDIENTS IN YOUR SUNSCREEN."



35.   That "oxibenzone, octinoxate, avobenzone, homosalate, octocrylene, [and] octisalate" have been linked to coral bleaching and harm to coral reefs has been confirmed by independent studies.

36.   Independent watchdog groups have cautioned consumers of labels like "reef friendly" applied to traditional chemical sunscreens, based on possibly containing any of the above-identified ingredients which cause harm to coral reefs.

37.   For example, research has shown that the common sunscreen ingredient

of octocrylene may generate the chemical benzophenone, a carcinogen which "is bad for fish, corals, and other invertebrates."

38.   Though consumers buying Defendant's sunscreen expect it to be "reef friendly" and not harmful to coral reefs, it includes the "unfriendly" chemical ingredients of "Avobenzone (3.0%), Homosalate (10.0%), Octisalate (5.0%), [and] Octocrylene (4.0%)," only disclosed on the back of the container in fine print under "Active Ingredients."



39.   Moreover, it contains nine inactive ingredients, further down the label.



***Inactive ingredients***

Alcohol Denat., Butyloctyl Salicylate, Acrylates/Octylacrylamide Copolymer, Panthenol, Tocopherol, Fragrance, Stearoxytrimethylsilane, Caprylic/Capric Triglyceride, Glycerin

40.   Many of these nine chemical ingredients have been linked to causing harm to coral reef ecosystems.

41.   Nowhere on the labeling does the Product tell purchasers that its active ingredients of avobenzone, homosalate, octisalate, and octocrylene are harmful to coral reefs and not "reef friendly."

42.   Nowhere on the labeling does the Product tell purchasers that its inactive ingredients are harmful to coral reefs and not "reef friendly."

43.   According to renowned dermatologist Dr. Henry W. Lim of the Henry Ford Medical Center in Detroit, "The definition of what the manufacturer might mean by 'reef safe' and similar terms keeps broadening."

44.   One expert described these types of terms, including "reef friendly," as "really just a sales gimmick at the moment."

45. In response to an unregulated environment where companies misrepresented the attributes of products they sold to the public, the Pure Food and Drug Act of 1906 set minimum standards for truthfulness and transparency.

46. These requirements were strengthened by the Federal Food, Drug and Cosmetic Act ("FFDCA") in 1938, which adopted standards for what companies could tell the public about over-the-counter ("OTC") drugs. 21 U.S.C. § 301 *et seq*.; 21 C.F.R. Parts 200 and 300.

47. Florida adopted these laws in their entirety through its Drug and Cosmetic Act ("DCA") and accompanying regulations. Fla. Stat. § 499.001 *et seq*.; Fla. Stat. § 499.002(b) ("Provide uniform legislation to be administered so far as practicable in conformity with the provisions of, and regulations issued under the authority of, the [FFDCA] and that portion of the Federal Trade Commission Act which expressly prohibits the false advertisement of drugs, devices, and cosmetics."); Fla. Admin. Code Chapter 61N-1 ("Regulations for Drugs, Devices and Cosmetics"); Fla. Admin. Code R. 61N-1.001 *et seq*.; Fla. Admin. Code R. 61N-1.006(1) ("The department adopts and incorporates by reference the labeling requirements for prescription drugs and over-the-counter drugs as set forth in the federal act at 21 U.S.C. [§§] 301 *et seq*. and in Title 21 Code of Federal Regulations Parts 1-1299").

48. These identical federal and state laws consider OTC products

12

"misbranded" "If its labeling is in any way false or misleading." Fla. Stat. §
499.007(1); 21 U.S.C. § 352(a)(1) (defining "misbranded" where an OTC product's
"labeling is false or misleading in any particular.").

49.   The labeling of the Product as "Reef Friendly" even though its active and
inactive ingredients are harmful to coral reefs results in its "misbranding," because
it misleads consumers.

50.   As a result of the false and misleading representations, the Product is
sold at a premium price, approximately no less than no less than approximately $4.88
for 5.5 oz (156 g), excluding tax and sales, higher than similar products, represented
in a non-misleading way, and higher than it would be sold for absent the misleading
representations and omissions.

## JURISDICTION

51.   Jurisdiction is based on the Class Action Fairness Act of 2005
("CAFA"). 28 U.S.C. § 1332(d)(2).

52.   The aggregate amount in controversy exceeds $5 million, including any
statutory or punitive damages, exclusive of interest and costs.

53.   Plaintiff is a citizen of Florida.

54.   Defendant is a citizen of Delaware based on its corporate formation.

55.   Defendant is a citizen of Arkansas based on its principal place of
business.

56. The class of persons Plaintiff seeks to represent includes persons who are citizens of a different state from which Defendant is a citizen.

57. The members of the proposed class Plaintiff seeks to represent are more than one hundred, because the Product has been sold at the approximately 386 Walmart stores in this State and online to citizens of this State.

58. The Court has jurisdiction over Defendant because it transacts business within Florida and sells the Product to consumers within Florida from the approximately 386 Walmart stores in this State and online to citizens of this State.

59. Defendant transacts business in Florida through the sale of the Product to citizens of Florida from the approximately 386 Walmart stores in this State and online to citizens of this State.

60. Defendant has committed tortious acts within this State through the distribution and sale of the Product, which is misleading to consumers in this State.

61. Defendant has committed tortious acts outside this State by labeling, representing and selling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, attributes, origins, amount and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product in this State.

62. Defendant has committed tortious acts outside this State by labeling the

Product in a manner which causes injury to consumers within this State by misleading them as to its contents, origins, amount and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

## VENUE

63.   Venue is in this District with assignment to the Tampa Division because a substantial part of the events or omissions giving rise to these claims occurred in Hillsborough County, which is where Plaintiff's causes of action accrued.

64.   Plaintiff purchased, paid money towards or for, used and/or consumed the Product in reliance on the representations and omissions identified here in Hillsborough County.

65.   Plaintiff first became aware that the representations and omissions, express and implied, were false and misleading, in Hillsborough County.

66.   Plaintiff resides in Hillsborough County.

## PARTIES

67.   Plaintiff Nakiah Alvarado is a citizen of Hillsborough County, Florida.

68.   Defendant Walmart Inc. is a Delaware corporation with a principal place of business in Arkansas.

69.   Walmart is an American multinational retail corporation that operates a

chain of over 5,000 supercenters throughout the nation, with almost four hundred in Florida, selling everything from furniture to electronics to groceries.

70.   While Walmart sells leading national brands, it also sells many products under one of its private label brands, Equate.

71.   Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

72.   Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

73.   Products under the Equate brand have an industry-wide reputation for quality.

74.   In releasing products under the Equate brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

75.   Walmart gets national brands to produce its private label items due its loyal customer base and tough negotiating.

76.   Private label products under the Equate brand benefit by their association with consumers' appreciation for the Walmart brand overall.

77.   That Equate branded products met this high bar was proven by focus groups, which rated them above their name brand equivalent.

78.   A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands [like Equate] are good alternatives to national brands, and more than 60 percent consider them to be just as good."

79.   Private label products generate higher profits for retailers like Walmart because national brands spend significantly more on marketing, contributing to their higher prices.

80.   The development of private label items is a growth area for Walmart, as they select only top suppliers to develop and produce Equate products.

81.   Plaintiff and consumers understood "Reef Friendly" to mean the sunscreen would not cause harm to coral reefs when it is worn in the ocean and open waters.

82.   Plaintiff read and relied on the front label which said "Reef Friendly" above a picture of a coral reef.

83.   Plaintiff relied on the omissions which failed to tell her that its ingredients were harmful to coral reefs.

84.   Plaintiff was not aware that the Product's active and inactive ingredients were harmful to coral reefs.

85.   Plaintiff sought to purchase sunscreen that would not cause harm to coral reefs.

86.   As a citizen of Florida, Plaintiff is aware of how coral reefs are incredible

environments and should be protected.

87.   Plaintiff, like many consumers, seeks to purchase products which have a reduced environmental impact relative to other products.

88.   Plaintiff purchased the Product between October 2019 and October 2023, at Walmart locations in Hillsborough County, and/or other areas.

89.

90.   Plaintiff bought the Product at or exceeding the above-referenced price.

91.   Plaintiff paid more for the Product than she would have had she known it was not "Reef Friendly," as she would not have bought it or would have paid less.

92.   The Product was worth less than what Plaintiff paid, and she would not have paid as much absent Defendant's false and misleading statements and omissions.

## CLASS ALLEGATIONS

93.   Plaintiff seeks to represent the following class:

> All persons in the State of Florida who purchased the Product in Florida during the statutes of limitations for each cause of action alleged.

94.   Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

95.   Plaintiff's claims and basis for relief are typical to other members

because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

96.  Plaintiff is an adequate representative because his interests do not conflict with other members.

97.  No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

98.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

99.  Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

## CAUSES OF ACTION

### COUNT I
Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),
Fla. Stat. § 501.201, *et seq.*

100. Plaintiff incorporates by reference paragraphs 1-34.

101. The purpose of FDUTPA is to protect consumers against unfair and deceptive practices.

102. This includes "making state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3).

103. The labeling of the Product violated FDUTPA because the

representations and omissions that it was "Reef Friendly" above a picture of a coral reef was unfair and deceptive to consumers, since it contained ingredients which are harmful to coral reefs. Fla. Stat. § 501.204(1).

104. The labeling of the Product violated FDUTPA because the representations and omissions, and its sale to the public, was contrary to the DCA, which adopted the FFDCA and accompanying regulations.

105. The FFDCA and its regulations prohibit consumer deception by companies in the labeling of OTC drug products. Fla. Stat. § 501.203(3)(c).

106. Plaintiff believed the Product was "Reef Friendly" and that its use would not cause harm to coral reefs.

107. Plaintiff paid more for the Product, would not have purchased it or paid as much if she knew that it was not "Reef Friendly" and that its ingredients caused harm to coral reefs.

108. Plaintiff seeks to recover for economic injury and/or loss he sustained based on the misleading labeling and packaging of the Product, a deceptive practice under this State's consumer protection laws, by paying more for it than she otherwise would have.

109. Plaintiff will produce evidence showing how he and consumers paid more than they otherwise would have paid for the Product, relying on Defendant's representations and omissions, using statistical and economic analyses, hedonic

regression, and other advanced methodologies.

110. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

## COUNT II
### False and Misleading Adverting,
### Fla. Stat. § 817.41

111. Plaintiff incorporates by reference paragraphs 1-34.

112. Defendant made misrepresentations and omissions of material fact, that the Product was "Reef Friendly" and that its use would not cause harm to coral reefs, through its advertisements and marketing in various forms of media, product packaging and descriptions, and targeted digital advertising.

113. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

114. Plaintiff paid more for the Product, would not have purchased it or paid as much if she knew that "Reef Friendly" above a picture of a coral reef was used to describe a product containing ingredients which cause harm to coral reefs.

115. Defendant knew these statements and omissions, implied and expressed, were false and/or misleading.

116. Defendant intended for consumers to rely on its false statements and omissions for the purpose of selling the Product.

117. Plaintiff and class members did in fact rely upon these statements.

118. Reliance was reasonable and justified because companies like Defendant know consumers are increasingly seeking products which promote their environmental attributes.

119. As a result of Defendant's misrepresentations and omissions, Plaintiff and class members suffered damages in the amount paid for the Product and the premium amount paid.

## COUNT III
### Fraud

120. Plaintiff incorporates by reference paragraphs 1-34.

121. Plaintiff satisfied the requirements of fraud by establishing relevant elements with sufficient particularity.

122. WHO: Defendant, Walmart, made material misrepresentations and/or omissions of fact in its advertising and marketing of the Product by representing it as "Reef Friendly" above a picture of a coral reef, even though it contained ingredients which cause harm to coral reefs.

123. WHAT: Defendant's conduct was and continues to be fraudulent because it misleads consumers into believing the Product was "Reef Friendly" through words and images, even though it contained ingredients which cause harm to coral reefs.

124. Defendant omitted telling consumers the Product was not "Reef Friendly" because it contained ingredients which cause harm to coral reefs.

125. Defendant knew or should have known this information was material to all reasonable consumers and impacts their purchasing decisions.

126. Defendant conducted or relied on research about consumer purchasing habits and knew almost all consumers value protecting the environment and would pay more for such products.

127. Defendant highlighted these attributes in selling the Product to consumers.

128. The records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of this falsity and deception, through statements and omissions.

129. Yet, Defendant has represented and/or continues to represent that the Product was "Reef Friendly" above a picture of a coral reef, even though it contained ingredients which cause harm to coral reefs.

130. WHEN: Defendant made these material misrepresentations and/or omissions detailed herein, during the applicable class period.

131. WHERE: Defendant's material misrepresentations and omissions, that the Product was "Reef Friendly" above a picture of a coral reef, even though it contained ingredients which cause harm to coral reefs, were made in the advertising and marketing of the Product, on the front of the packaging, which all consumers buying would inevitably see and take notice of.

132. HOW: Defendant made written and visual misrepresentations and omissions in the advertising and marketing of the Product, that it was "Reef Friendly" above a picture of a coral reef, even though it contained ingredients which cause harm to coral reefs.

133. And as discussed in detail throughout this Complaint, Plaintiff and class members read and relied on Defendant's representations and omissions that the Product was "Reef Friendly" above a picture of a coral reef, even though it contained ingredients which cause harm to coral reefs, before purchasing the Product.

134. WHY: Defendant misrepresented that the Product was "Reef Friendly" above a picture of a coral reef, even though it contained ingredients which cause harm to coral reefs, for the express purpose of inducing Plaintiff and class members to purchase the Product at a substantial price premium, in part based on consumer demand for products which were better for the environment and caused less or no environmental harm.

135. As such, Defendant profited by selling the misrepresented Product to thousands of consumers throughout this State.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and

the undersigned as counsel for the class;

2.  Awarding monetary damages and interest;

3.  Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4.  Other and further relief as the Court deems just and proper.

Dated:   November 11, 2023

Respectfully submitted,

/s/ William Wright
The Wright Law Office, P.A.
515 N Flagler Dr Ste P300
West Palm Beach FL 33401
(561) 514-0904
willwright@wrightlawoffice.com

*Notice of Lead Counsel Designation:*

*Lead Counsel for Plaintiff*

William Wright

The Wright Law Office, P.A.

Sheehan & Associates, P.C.
Spencer Sheehan*
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com

*Counsel for Plaintiff*

**Pro Hac Vice* Application Forthcoming